**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ALABAMA ORTHOPAEDIC CLINIC, P.C.** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO.:** |
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Defendant** | * | |

## COMPLAINT

ALABAMA ORTHOPAEDIC CLINIC, P.C. ("AOC") brings this action against the United States pursuant to 26 U.S.C. § 7422, for a refund of internal revenue taxes totaling $4,790,892.87 (plus interest) owed to it (the "ERC refunds") – and wrongfully denied by the Internal Revenue Service ("IRS") – as Employee Retention Credits ("ERC").[1] Under the Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, March 27, 2020, 134 Stat 281 ("CARES Act") and Internal Revenue Code § 3134, which created the ERC, Plaintiff is entitled to ERC refunds for the tax periods ending March 31, 2021 ("Q1 2021"), June 30, 2021 ("Q2 2021"), and September 30, 2021 ("Q3 2021").

## NATURE OF ACTION

1. Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney fees), authorized to be paid to Plaintiff under I.R.C. § 3134 and the CARES Act, but wrongfully denied by the IRS. This Complaint is proper under 28 U.S.C. § 2401 and under I.R.C.

[1] Employee Retention Credits or ERC are also interchangeably referred to as Employee Retention Tax Credits or ERTC.

§§ 6532 and 7422, as Plaintiff's ERC claims were duly filed more than 6 months prior to the filing of this Complaint.[2]

## PARTIES

2. During the relevant quarters of 2020 and 2021, Plaintiff AOC was a professional corporation of orthopedic surgeons serving patients in 3 different locations in Mobile, Alabama. On March 24, 2025, Plaintiff AOC administratively dissolved its corporate existence. However, pursuant to Code of Alabama § 10A-2A-14.05, this professional corporation may wind up its "business and affairs" and in doing so may "prosecute, defend or settle actions or proceedings whether civil, criminal or administrative." [3]

3. The Defendant is the United States of America.

## JURISDICTION AND VENUE

4. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), and under 26 U.S.C. (I.R.C.) § 7422.

5. Venue in this Court is proper under 28 U.S.C. § 1402(a)(2) and 1391(e)(1), as Plaintiff's principal place of business is located in this judicial district.

6. This Complaint is timely under 28 U.S.C. § 2401(a) and under I.R.C. §§ 6532(a)(1) and 7422(a) because Plaintiff filed a claim for its ERC refund with the Secretary more than six months prior to the date of filing this Complaint.

## THE EMPLOYEE RETENTION CREDIT

7. Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted

---

[2] See Exhibit "A"-Plaintiff's 941X for Q1 2021, Q2 2021, Q3 2021, and Form 2848 Power of Attorney that was attached to each 941X.

[3] The provisions of the Alabama Business Corporation Law apply to a professional corporation. § 10A-4-1.02. Applicability of Business Corporation Law and Nonprofit Corporation Law.

the United States' local and national economies. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID- 19. The governmental response to that public health emergency involved historically unprecedented measures, including lock down orders, social distancing mandates, and forced business closures. The economic effects of those policies were profound. Deemed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion.[4]

8. In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the ERC.[5]

9. The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the unprecedented challenges posed by the pandemic. Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy. The credit is available to certain eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

10. The ERC is a payroll tax credit available to certain employers who qualify under the CARES Act. Employers file an amended quarterly payroll tax return (a 941X) with the IRS to claim the ERC credit.

---

[4] Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion, The HARVARD GAZETTE, Nov. 10, 2020.* https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16-trillion/.

[5] Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, §2301, 134 Stat 281 (March 27, 2020).

11. Plaintiff AOC duly claimed ERC credits for tax periods ending March 31, 2021 ("Q1 2021"), June 30, 2021 ("Q2 2021"), and September 30, 2021 ("Q3 2021"). The IRS has taken no action on Plaintiff's claims, which are the subject of this suit for refund, for more than six months.

**Threshold Requirement – 3 Ways to Qualify for an ERC**

12. An employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue and satisfies one of three prongs for eligibility: (1) significant declining gross receipts; (2) full or partial suspension of operations due to government orders, or (3) recovery startup business.[6] CARES Act § 2301(c)(2); I.R.C. § 3134(c)(2).[7]

**The Suspension Test**

13. A business can qualify as an eligible employer to receive ERC using the suspension test. Under this second prong for determining eligibility, an employer is eligible to claim ERC credits if "the operation of [Plaintiff's] trade or business [was] fully or partially suspended . . . due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." I.R.C. § 3134(c)(2)(A)(ii)(I). AOC clearly meets this prong.

14. Eligibility under the "suspension test" under the CARES Act § 2301(c)(2) or I.R.C. § 3134(c)(2)(A)(ii)(I) contains no financial element whatsoever.

15. The CARES Act § 2301(c)(2) and I.R.C. § 3134(c)(2)(A)(ii)(I) do not require

---

[6] Plaintiff is not a "recovery startup business" as defined under I.R.C.§3134(c)(2)(A)(ii)(III), and so it does not claim ERC credits thereunder, nor does it claim the credit under the significant decline in gross receipts prong.

[7] The current version of I.R.C. § 3134 became effective on November 15, 2021 and, as relevant here, is identical to the version of I.R.C. § 3134 in effect from March 11, 2021, to November 14, 2021, and to the version of the CARES Act in effect from January 1, 2021, to March 10, 2021. For ease of reference, this Complaint cites I.R.C. § 3134 when discussing 2021 ERC requirements.

eligible employers to have suffered any decline in gross receipts at all in order to qualify for ERC credits using the suspension test. Also, the suspension test does not require an employer's business to shut down completely at any point at all during the pandemic.[8]

**AOC's Eligibility for the Credit**

16. AOC duly filed for and is eligible to receive ERC under the suspension test for Q1 2021, Q2 2021, and Q3 2021.

17. Despite AOC's ERC eligibility for all quarters claimed, the IRS has ignored these claims.

**The ERC Generally**

18. Employers who qualify for the ERC for the first three quarters of 2021 may receive a credit of up to $7,000 per employee for each quarter in which they qualify. Consolidated Appropriations Act of 2020 (CAA), Pub. L. No. 116-260, §207(b).

19. The amount of ERC is not limited to the amount of employment taxes the employer paid, and against which the credit is applied. Rather, if the amount of the credit exceeds the applicable employment taxes for the calendar quarter, "such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." CARES Act § 2301(b)(3); I.R.C. § 3134(b)(3).

**ALABAMA ORTHOPAEDIC CLINIC, P.C.**

20. During all applicable quarters of the pandemic, ALABAMA ORTHOPAEDIC

---

[8] In fact, IRS Notice 2021-20 interprets a partial suspension to occur if the employer's operations continue but "are subject to modification due to a governmental order (for example, to satisfy distancing requirements), [then] such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances." *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act* IRS Notice 2021-20 *(Answer 17).*

CLINIC, P.C. was a professional corporation of orthopedic surgeons operating 3 locations in the Mobile, Alabama area. Plaintiff's principal place of business was in Mobile, Alabama.

21. AOC's main location was Mobile. A billing office and professional and administrative departments were onsite. Prior to the pandemic, there were generally more than 60 employees staffing the main location in Mobile. AOC was also affiliated with the Mobile Infirmary medical center in Saraland, Alabama. Prior to the pandemic, patients would come to AOC to be evaluated for orthopedic issues. These evaluations included using clinical observations and diagnostic testing, including x-rays, CT scans, and MRIs. Prior to the pandemic, patients received treatment including physical therapy, prescription drug therapy and surgery, if needed. AOC also treated urgent care patients from other facilities in the area. AOC doctors would also take "call" at two hospitals and were either in clinic or in surgery every workday.

22. Due to the pandemic and resulting governmental orders, beginning in March 2020, on the administrative side, some employees transitioned to remote work and work hours were reduced. AOC could not maintain full-time status for all of its employees because there was a significant decrease in the volume of patients due to orders requiring social distancing, among other things. As a result, AOC was forced to reduce employee work hours. Employees were required to follow social distancing requirements and CDC regulations such as limitations on the number of patients that could enter the facility to be treated.

23. Treatment was substantially limited due to governmental orders as hospitals and facilities only allowed emergency-based and essential surgeries. Some of the largest reimbursing cases were not considered essential. Many cases in orthopedic surgery were considered elective, so the restrictions on the type of surgeries that could be performed had a significant negative impact on AOC's productivity and revenue. The mandates were communicated to AOC primarily by the

Alabama Department of Health, the CDC, and OSHA. The restrictions were from March 2020 to April 30, 2020. AOC experienced a more than 50% decrease in the number of surgeries performed when compared to the same periods of time in 2019.

24. Social distancing requirements resulted in limitations on the number of patients AOC could treat at its facilities. AOC labeled the floors of the waiting room to ensure social distancing protocols were followed. AOC was limited in the number of patients scheduled which delayed scheduling clinic visits, physical therapy, surgeries and other treatments. For example, instead of scheduling a patient visit for a week later, AOC had to schedule for a month later because of the physical limitations of social distancing. AOC was operating at about 25%-50% capacity.

25. CDC quarantining requirements affected AOC's productivity. AOC had to follow the required amount of time off employees had to have if an employee had a positive Covid test--which was 10-14 days. AOC's staff were significantly affected by COVID and the quarantining requirements negatively impacted AOC's operations. Many hospitals were filled with COVID patients, so AOC did not have access to those facilities. Usually, AOC would get referrals from hospitals in the area, but because the hospitals were full of COVID patients AOC did not get as many referrals. The referral patients from the area hospitals were usually the emergent cases.

26. CDC recommendations, limiting state statutes, federal regulations, vaccination requirements and rules regarding who was permitted in surgery lasted until 2022. There were substantial limitations placed on AOC, its staff and operation and on patients exposed to Covid being able to have surgery, all due to governmental orders.

27. Patients with COVID exposures could not be brought in for surgery. Through 2021, employees wore masks and performed enhanced cleaning. The janitorial staff had to fog the facility for disinfection. One employee lost their life to COVID. A large portion of AOC's practice had to

go virtual which was difficult considering the required treatment involved and the additional technological expenses associated with virtual visits. AOC regularly has to examine patients' range of motion and perform x-rays, but because much of the business had to go virtual, the treatment of patients was limited which caused delays in AOC's process and resulted in less efficient and less effective treatment. Orthopedic exams ideally should be hands-on exams where doctors often inject a patient's joint which was impossible to do virtually. At least 25% of AOC's work became virtual and that virtual work was 50% less productive.

28. As set forth above and below, restrictions due to government orders from an appropriate governmental authority had the effect of both fully and partially shutting down AOC and had a greater than nominal impact on AOC's productivity, revenue and operations.

29. Because AOC's operations were partially suspended due to government orders that meet the statutory criteria for the claimed quarters in 2021, AOC is entitled to its claimed ERC, plus interest, attorney fees and costs.

**First Quarter 2021**

30. On or about May 22, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q1 2021. ("Q1 2021 Form 941-X").

31. Line 18a of the Q1 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $237,903.82.

32. Line 26a of the Q1 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $1,349,644.12.

33. Line 30 of the Q1 2021 Form 941-X reported $2,267,925.63 in qualified wages for the ERC.

34. Line 31a of the Q1 2021 Form 941-X reported $0 in qualified health plan expenses for the ERC.

35. Based upon the foregoing, Plaintiff timely claimed an ERC for Q1 2021 in the amount of $1,587,547.94

36. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q1 2021.

**Second Quarter 2021**

37. On or about May 22, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q2 2021. ("Q2 2021 Form 941-X").

38. Line 18a of the Q2 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $235,582.81.

39. Line 26a of the Q2 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $1,359,214.25.

40. Line 30 of the Q2 2021 Form 941-X reported $2,278,281.51 in qualified wages for the ERC6.

41. Line 31a of the Q2 2021 Form 941-X reported $0 in qualified health plan expenses for the ERC.

42. Based upon the foregoing, Plaintiff timely claimed an ERC for Q2 2021 in the amount of $1,594,797.06.

43. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q2 2021.

**Third Quarter 2021**

44. On or about May 22, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q3 2021. ("Q3 2021 Form 941-X").

45. Line 18a of the Q3 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $74,919.59.

46. Line 26a of the Q3 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $1,533,628.28.

47. Line 30 of the Q3 2021 Form 941-X reported $2,297,925.53 in qualified wages for the ERC6.

48. Line 31a of the Q3 2021 Form 941-X reported $0 in qualified health plan expenses for the ERC.

49. Based upon the foregoing, Plaintiff timely claimed an ERC for Q3 2021 in the amount of $1,608,547.87.

50. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q3 2021.

**CAUSES OF ACTION**

51. Pursuant to I.R.C. § 7422, a taxpayer may file a civil action against the United States for the recovery of taxes after a claim for refund has been filed with the Secretary.

52. Pursuant to I.R.C. § 6532, no suit for refund shall begin (a) prior to the expiration of six months from the date of filing the claim for refund, or (b) after the expiration of two years from the date the Secretary notifies the taxpayer that its claim has been disallowed.

53. Plaintiff satisfies each of these requirements.

54. Plaintiff qualified for the ERC for Q1 2021, Q2 2021, and Q3 2021 under the suspension test.

55. The IRS has not paid Plaintiff's ERC claims for Q1 2021, Q2 2021, or Q3 2021, nor has it issued a Letter 105C notifying Plaintiff that any of its claims have been disallowed.

56. The IRS has ignored Plaintiff's claims and they have been pending for more than six months.

57. Plaintiff is entitled to the full amount of ERC claimed, together with interests pursuant to I.R.C. § 6611, as well as reasonable attorney fees and legal costs associated with this cause of action, pursuant to 28 U.S.C § 2412 and/or I.R.C. § 7430.

**Count One**
**Q1 2021 Refund Claim**

58. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

59. Plaintiff is an eligible employer qualified to receive $1,587,547.94 of ERC for Q1 2021.

60. On or about May 22, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q1 2021 in the amount of $1,587,547.94.

61. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $1,587,547.94, along with statutory interest.

**Count Two**
**Q2 2021 Refund Claim**

62. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

63. Plaintiff is an eligible employer qualified to receive $1,594,797.06 of ERC in Q2

2021.

64. On or about May 22, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q2 2021 in the amount of $1,594,797.06.

65. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $1,594,797.06, along with statutory interest.

**Count Three**
**Q3 2021 Refund Claim**

66. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

67. Plaintiff is an eligible employer qualified to receive $1,608,547.87 of ERC in Q3 2021.

68. On or about May 22, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q3 2021 in the amount of $1,608,547.87.

69. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $1,608,547.87, along with statutory interest.

**Count Four**
**Attorney Fees and Administrative Costs**

70. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

71. In addition to its refund and statutory interest, Plaintiff is also entitled to its administrative costs, including attorneys' fees.

72. The Defendant must pay reasonable litigation and administrative costs to a prevailing party unless its position in the proceeding was “substantially justified.” I.R.C. § 7430(c)(4)(B).

73. Here, the Defendant's position was not substantially justified.

74. In failing to pay Plaintiff's 2020 ERC claims that were objectively due based upon the full or partial suspension of Plaintiff's operations as provided for in the clear language under I.R.C. § 3134, and for the 2021 quarters claimed, the Defendant's position was not substantially justified.

75. Plaintiff's entitlement to the ERCs at issue is straightforward. The Defendant's refusal to promptly pay the ERC refund now past due is, therefore, not substantially justified.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter a judgment against Defendant, the United States of America, for:

(A) A tax refund for Q1 2021 representing ERC in the amount of $1,587,547.94 with statutory interest thereupon;

(B) A tax refund for Q2 2021 representing ERC in the amount of $1,594,797.06, with statutory interest thereupon;

(C) A tax refund for Q3 2021 representing ERC in the amount of $1,608,547.87, with statutory interest thereupon;

(D) Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law; and

(E) All other relief as this Court deems necessary.

Respectfully submitted, this the 7th day of April, 2025.

*<u>/s/ Keith B. Franklin</u>*
E.J. SAAD (ASB 8614D51E)
MATTHEW ANDREWS (ASB 1672E47A)
JAMIE F. LEE (PRO HAC)
KEITH B. FRANKLIN (ASB 8196A56K)
*Attorneys for Alabama Orthopaedic Clinic, P.C.*

OF COUNSEL:

E.J. SAAD LAW FIRM
6207 Cottage Hill Road, Ste. G
Mobile, AL 36609
Phone: (251) 660-0888
ejsaad@ejsaadlaw.com
mandrews@ejsaadlaw.com
jamielee@ejsaadlaw.com
k.franklin@ejsaadlaw.com